IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

| | |
|---|---|
| IN RE: DEPUY ORTHOPAEDICS, INC., PINNACLE HIP IMPLANT PRODUCTS LIABILITY LITIGATION | Civil Action No. 3:11-md-02244<br>MDL No. 2244 (Judge Kinkeade) |
| This Document Relates to:<br><br>CINDY GREENWOOD,<br><br>      Plaintiffs,<br><br>v.<br><br>DEPUY ORTHOPAEDICS, INC.,<br><br>      Defendant. | Case No. 3:11-cv-03585-K |

## AMENDED COMPLAINT FOR DAMAGES

### INTRODUCTION

1. This product liability case is about the failure of an untested and unapproved hip implant that was designed, manufactured, and sold by the Defendant and implanted in Plaintiff Cindy Greenwood.

2. Plaintiff Cindy Greenwood is a citizen of the State of California and resides in San Jose, California.

3. On information and belief, Defendant DePuy Orthopedics, Inc. ("DePuy") is a corporation organized and existing under the laws of Indiana with its primary place of business in Warsaw, Indiana. On information and belief, DePuy does not maintain a principle local office in California. DePuy designed, manufactured, and sold the hip implant that is the subject of this lawsuit.

1

4.  DePuy, is referred to herein as "Defendant."

## FACTUAL BACKGROUND

### A. DePuy's Pinnacle Hip Is Unsafe And Has Not Been Adequately Tested

5.  The hip joint is where the femur connects to the pelvis. The joint is made up of the femoral head (a ball-like structure at the very top of the femur) rotating within the acetabulum (a cup-like structure at the bottom of the pelvis.) In a healthy hip, both the femur and the acetabulum are strong and the rotation of the bones against each other is cushioned and lubricated by cartilage and fluids.



6.  A total hip replacement replaces the body's natural joint with an artificial one, usually made out of metal and plastic. A typical total hip replacement system consists of four separate components: (1) a femoral stem (labeled as "hip implant" in the diagram to the left), (2) a femoral head, (3) a plastic (polyethylene) liner, and (4) an acetabular shell. After the surgeon hollows out a patient's femur bone, the femoral stem is implanted. The femoral head is a metal ball that is fixed on top of the femoral stem. The femoral head forms the hip joint when it is placed inside the polyethylene liner and acetabular shell.



7.  The Pinnacle Hip has a different design, one that puts the metal femoral ball directly in contact with a metal acetabular liner. The design of the Pinnacle Hip was not sufficiently tested by the Defendant, and it was never approved by the FDA as being safe or effective for the products' intended purpose.

2

8. The Pinnacle Hip is a Class III medical device. Class III devices are those that operate to sustain human life, are of substantial importance in preventing impairment of human health, or pose potentially unreasonable risks to patients.

9. The Medical Device Amendments to the Food, Drug, and Cosmetics Act of 1938 ("MDA"), in theory, require Class III medical devices, including the Pinnacle Hip, to undergo premarket approval by the FDA, a process which obligates the manufacturer to design and implement a clinical investigation and to submit the results of that investigation to the FDA.

10. Premarket approval is a rigorous process that requires a manufacturer to submit what is typically a multivolume application that includes, among other things, full reports of all studies and investigations of the device's safety and effectiveness that have been published or should reasonably be known to the applicant; a full statement of the device's components, ingredients, and properties and of the principle or principles of operation; a full description of the methods used in, and the facilities and controls used for, the manufacture, processing, and, when relevant, packing and installation of, such device; samples or device components required by the FDA; and a specimen of the proposed labeling.

11. The FDA may grant premarket approval only if it finds that there is reasonable assurance that the medical device is safe and effective and must weigh any probable benefit to health from the use of the device against any probable risk of injury or illness from such use.

12. A medical device on the market prior to the effective date of the MDA – a so-called "grandfathered" device – was not required to undergo premarket approval.

13. In addition, a medical device marketed *after* the MDA's effective may bypass the rigorous premarket approval process if the device is "substantially equivalent" to a "grandfathered" pre-MDA device (*i.e.*, a device approved prior to May 28, 1976). This

exception to premarket approval is known as the "510(k)" process and simply requires the manufacturer to notify the FDA under section 510(k) of the MDA of its intent to market a device at least 90 days prior to the device's introduction on the market, and to explain the device's substantial equivalence to a pre-MDA predicate device. The FDA may then clear the new device for sale in the United States.

14. The MDA does not require an FDA determination that the device is in fact, substantially equivalent to a grandfathered device.

15. Instead of assuring the safety of the Pinnacle Hip through clinical trials, DePuy sought to market its Pinnacle Hip without conducting any clinical trials by obtaining FDA approval under section 510(k). To that end, Defendant submitted a section 510(k) premarket notification of intent to market the Pinnacle Hip.

16. By telling the FDA that the Pinnacle Hip's design was "substantially equivalent" to other hip products on the market, DePuy was able to avoid the safety review required for premarket approval under FDA regulations including clinical trials.

17. The FDA cleared the Pinnacle Hip for sale by means of the abbreviated 510(k) process and consequently, the FDA did not require the Pinnacle Hip to undergo clinical trials.

18. The 510(k) notification for the Pinnacle Hip includes only Defendant DePuy's assertion that it believes the DePuy Pinnacle Hip to be substantially equivalent to devices that themselves had never been reviewed for safety and effectiveness.

19. Significantly, unlike the premarket approval process, the 510(k) notification process does not call for scrutiny – or even clinical testing – of a device's safety and effectiveness.

20. A finding of substantial equivalence is not equivalent to a finding of a device's

safety and effectiveness. This point is forcefully underscored by the FDA's letter to DePuy, which says nothing about the safety and effectiveness of the Pinnacle Hip; finds only that the device was "substantially equivalent to devices introduced into interstate commerce prior to May 28, 1976"; and concludes by stressing that the agency's determination of substantial equivalence "does not mean that FDA has made a determination that your device complies with other requirements of the Act or any Federal statutes and regulations administered by other Federal agencies.".

21. Thus, the FDA's finding of "substantial equivalence" had nothing to do with reviewing the Pinnacle Hip's safety and effectiveness, but rather only a determination of equivalence to devices that themselves underwent no safety and effectiveness review.

22. While most hip replacements use a polyethylene *plastic* acetabular liner, DePuy's Pinnacle Hip has a critical difference: it uses a *metal* acetabular liner. By using a metal acetabular liner and a metal femoral ball, the Pinnacle Hip forces metal to rub against metal with the full weight and pressure of the human body. Because of Defendant's defective design for the Pinnacle Hip, hundreds of patients—including Plaintiff—have or will be forced to undergo surgeries to replace the failed hip implants.

23. Plaintiff believes that the Pinnacle Hip suffers from a similar design or manufacturing defect that forced DePuy to recall over 93,000 metal-on-metal ASR and ASR XL hip implants. While the exact nature of the common defect is still being investigated, Plaintiff believes that the hip implants suffer from one or more similar design or manufacturing defects that cause excessive amounts of cobalt and chromium to wear from the surface of the acetabular insert or from the femoral head. These cobalt and chromium fragments prompt the body to react by rejecting the hip implant. This rejection often manifests with symptoms of pain, looseness,

dislocation, and squeaking and popping sounds. Inside the hip joint, the metal reaction often causes fluids to accumulate and soft tissues and bone to die.

**B.     DePuy Should Have Recalled The Pinnacle Hip Years Ago; Over 1,300 Adverse Events Related To The Pinnacle Hip Have Been Reported**

24.    It wasn't long after DePuy launched the Pinnacle Hip that reports of failures began flooding into DePuy. For example, on May 4, 2002, DePuy received a complaint that a patient had to undergo a surgery to remove and replace the hip implant because the liner disassociated with the cup. DePuy closed its investigation of this complaint, finding that "corrective action is not indicated." Two weeks later, on May 17, 2002, DePuy received another report that another patient had to undergo surgery to remove and replace a defective hip implant because the acetabular cup had loosened. Again, DePuy closed its investigation of this complaint, finding that "corrective action is not indicated."

25.    DePuy would go on to receive hundreds of similar complaints reporting that the Pinnacle Hip had failed due to premature loosening of the acetabular cup and that the failure had forced patients to undergo painful and risky surgeries to remove and replace the failed hip component.

26.    By the time DePuy sold the Pinnacle Hip to Cindy Greenwood, DePuy had received hundres of complaints related to the Pinnacle Hip. Consequently, DePuy was fully aware that the Pinnacle Hip was defective and that hundreds of patients already had been injured by that defect. Based on this information, DePuy should have recalled the Pinnacle Hip before it was sold to Plaintiff. At minimum, DePuy should have stopped selling the defective implant when it became aware that it has catastrophically failed in several patients.

27. As the chart to the right shows, over the next two years, reports that the Pinnacle implant had failed were flooding into DePuy. For example, by the end of 2008, DePuy had received more than 430 reports and by the end of 2009, that number  had skyrocketed to almost 750. To date, DePuy has received an astonishing *1,300 reports* associated with Pinnacle Hips.

28. Despite its knowledge that the Pinnacle Hip had a defect and that it had failed hundreds of times, causing hundreds of patients to undergo the agony of another surgery, DePuy continued to sell the defective hip implant. In so doing, DePuy actively concealed the known defect from doctors and patients—including Plaintiff and her doctor—and misrepresented that that the Pinnacle Hip was a safe and effective medical device.

29. DePuy's reason to conceal the defect in its Pinnacle Hip is clear. In 2009 alone, DePuy brought in more than $5.4 billion in sales. Hip implant sales are critically important to DePuy's parent company, Johnson & Johnson, and DePuy is one of Johnson & Johnson's most profitable business groups. In 2008, DePuy was faced with a critical defect in one of its hip implant systems. The last thing DePuy wanted to do was to admit that these popular products had a critical defect that could cause a premature failure, forcing patients to have to undergo another painful surgery. Focused on corporate profits, and at the expense of patient safety, DePuy decided that it would not issue an embarrassing recall when it learned of the defects with its Pinnacle Hip. Moreover, motivated by greed rather than patient safety, DePuy did not even

stop selling the Pinnacle Hip. Instead, it continued to manufacture the hip implants and it continued to sell them to unsuspecting patients like Plaintiff. To this day, DePuy continues to sell these defective implants to unsuspecting patients without any warning about the risks or the failures that have been reported to the company.

**C.      The Plaintiff's Pinnacle Hips Were Defective And Failed**

30.     On July 10, 2006, plaintiff underwent a surgical procedure to implant the Pinnacle Hip in her left hip. On November 13, 2006, plaintiff underwent a surgical procedure to implant the Pinnacle Hip in her right hip. By this time, Defendant had already received hundreds of adverse reports that the Pinnacle Hip had failed and it knew that the product was defective, but Defendant refused to disclose that information to Plaintiff, her physicians, or the public.

31.     The plaintiff's hips are defective and have caused damage to her hip joints and her body.

**FIRST CAUSE OF ACTION**
(Strict Product Liability)

32.     Plaintiff incorporates by reference paragraphs 1 through 31 of this Complaint as if fully set forth here and further allege as follows:

33.     Defendant designed, manufactured, promoted, distributed, marketed, and sold the DePuy Pinnacle Hip, including the Pinnacle acetabular cup, the Pinnacle metal liner, and the S-ROM metal-on-metal femoral head.

34.     At all times material hereto, the DePuy Pinnacle Hip that was designed, manufactured, promoted, distributed, marketed, and sold by the Defendant was expected to reach, and did reach, prescribing physicians and consumers, including Plaintiff, without substantial change in the condition in which it was sold.

35.     At all times material hereto, the DePuy Pinnacle Hip that was designed,

manufactured, promoted, distributed, marketed, and sold by the Defendant was in a defective and unreasonably dangerous condition at the time it was placed in the stream of commerce. Such condition included, but is not limited to, one or more of the following particulars:

(a) When placed in the stream of commerce, the DePuy Pinnacle Hip contained manufacturing defects, subjecting Plaintiff and others to risks, including the risk that the acetabular component would not properly grow into the bone, causing the hip system to prematurely fail and requiring a complex, risky, and painful surgery to remove and replace the defective product;

(b) When placed in the stream of commerce, the DePuy Pinnacle Hip contained unreasonably dangerous design defects and was not reasonably safe for the intended use, subjecting Plaintiff and others to risks, including the risk that the acetabular component would not properly grow into the bone, causing the hip system to prematurely fail and requiring a complex, risky, and painful surgery to remove and replace the defective product;

(c) The DePuy Pinnacle Hip was insufficiently tested; and/or

(d) The DePuy Pinnacle Hip was not accompanied by adequate instructions and/or warnings to fully inform Plaintiff or her physicians of the full nature or extent of the risks associated with its use.

36. Defendant knew or should have known of the dangers associated with the use of the DePuy Pinnacle Hip, as well as the defective nature of the DePuy Pinnacle Hip. Despite this knowledge, Defendant continued to manufacture, sell, distribute, promote and supply the DePuy Pinnacle Hip so as to maximize sales and profits at the expense of the public health and safety. Defendant's conduct was done in conscious disregard of the foreseeable harm caused by the DePuy Pinnacle Hip and in conscious disregard for the rights and safety of consumers such as

9

Plaintiff.

37. Plaintiff and her doctor used the DePuy Pinnacle Hips as directed for its intended purpose.

38. At all times herein mentioned, the DePuy Pinnacle Hips were defective, and Defendant knew that it was to be used by the user without inspection for defects therein. Moreover, neither plaintiff nor her physician knew or had reason to know at the time of the use of the subject products, of the existence of the aforementioned defects. Neither Plaintiff nor her physicians could have discovered the defects in the DePuy Pinnacle Hips through the reasonable exercise of care.

39. The DePuy Pinnacle Hip had not been materially altered or modified prior to its implantations in Plaintiff.

40. As a direct and proximate result of the failure of the defective DePuy Pinnacle Hips, Plaintiff suffered the injuries and damages as described herein.

## SECOND CAUSE OF ACTION
(Negligence)

41. Plaintiff incorporates by reference paragraphs 1 through 40 of this Complaint as if fully set forth here and further allege as follows:

42. At all times herein mentioned Defendant had a duty to exercise reasonable care in the design, manufacture, testing, inspection, labeling, and sale of the DePuy Pinnacle Hip to ensure that it would be safely used in a manner and for a purpose for which it was made.

43. Defendant maliciously, recklessly and/or negligently failed to exercise ordinary care in the design, manufacture, testing, advertising, marketing, and sale of the DePuy Pinnacle Hip.

44. Defendant maliciously, recklessly and/or negligently failed in their duty to

10

exercise reasonable care in the provision of an adequate warning to Plaintiff and her physicians as to the risks of the DePuy Pinnacle Hip.

45. Defendant maliciously, recklessly and/or negligently failed to exercise reasonable care in the post-marketing warnings as to the risks of the DePuy Pinnacle Hip when they knew or should have known of said risks.

46. As a result of Defendant's wrongful conduct, Plaintiff suffered injuries and damages as alleged herein.

### THIRD CAUSE OF ACTION
(Breach of Implied Warranties)

47. Plaintiff incorporates by reference paragraphs 1 through 46 of this Complaint as if fully set forth here and further allege as follows:

48. Prior to the time that the DePuy Pinnacle Hips were used by Plaintiff, Defendant impliedly warranted to Cindy Greenwood and her physicians that the DePuy Pinnacle Hip was of merchantable quality and safe and fit for the use for which it was intended.

49. Plaintiff and her physician were and are unskilled in the research, design and manufacture of the DePuy Pinnacle Hip, and they reasonably relied entirely on the skill, judgment and implied warranty of Defendant in using the DePuy Pinnacle Hip.

50. The DePuy Pinnacle Hip was neither safe for its intended use nor of merchantable quality, as warranted by Defendant, in that it had dangerous propensities when put to its intended use and would cause severe injuries to the user.

51. Defendant, by selling, delivering and/or distributing the defective DePuy Pinnacle Hips to Plaintiff breached the implied warranty of merchantability and fitness and caused Plaintiff to suffer severe pain and emotional distress, incur medical expenses and incur a loss of earning capacity.

52. As a result of the aforementioned breach of implied warranties by Defendant, Plaintiff suffered injuries and damages as alleged herein.

## FOURTH CAUSE OF ACTION
(Breach of Express Warranty)

53. Plaintiff incorporates by reference paragraphs 1 through 52 of this Complaint as if fully set forth here and further allege as follows:

54. At all times herein mentioned, Defendant expressly warranted to Plaintiff and Plaintiff's physicians, by and through statements made by Defendant or their authorized agents or sales representatives, orally and in publications, package inserts and other written materials intended for physicians, medical patients and the general public, that the aforementioned DePuy Pinnacle Hip was safe, effective, fit and proper for its intended use.

55. In utilizing the aforementioned DePuy Pinnacle Hips, Plaintiff and her physician relied on the skill, judgment, representations and foregoing express warranties of Defendant.

56. Said warranties and representations were false in that the aforementioned DePuy Pinnacle Hips were not safe and were unfit for the uses for which they was intended.

57. As a result of the foregoing breach of express warranties by Defendant, Plaintiff suffered injuries and damages as alleged herein.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against the Defendant as follows:

1. For general (non-economic) damages according to proof at the time of trial;

2. For special (economic) damages according to proof at the time of trial;

3. For punitive damages in an amount sufficient to deter and punish Defendant for

their willful and malicious conduct as alleged herein;

      3.     For prejudgment interest as permitted by law;

      4.     For costs of suit incurred herein as permitted by law;

5.     For such other and further relief as this Court may deem proper.

Date: September 28, 2022.                Respectfully Submitted,

                                                      KERSHAW TALLEY BARLOW PC

                                                      */s/ Stuart C. Talley*
                                                      Stuart C. Talley, Esq.
                                                      401 Watt Avenue
                                                      Sacramento, CA 95864
                                                      Telephone: 916-779-7000
                                                      Fax: 916-244-4829
                                                      Email: stuart@ktblegal.com
                                                      Counsel for Plaintiff

## CERTIFICATE OF SERVICE

    I hereby certify that on September 28, 2022, I electronically filed the foregoing with Clerk of the Court using CM/ECF system which will send notification of such filing to all parties that are CM/ECF participants in this action.

                                                       /s/ *Stuart C. Talley*
                                                       Stuart C. Talley